# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### AUSTIN DIVISION

| | | |
|---|---|---|
| **THE HEIDI GROUP, INC.**<br>      **Plaintiff** | §<br>§<br>§ | |
| | § | |
| **VS.** | §<br>§ | |
| | § | |
| **TEXAS HEALTH AND HUMAN**<br>**SERVICES      COMMISSION;**<br>**CECILE ERWIN YOUNG, in her**<br>**official   capacity   as   COMMIS-**<br>**SIONER  OF  TEXAS  HEALTH**<br>**AND  HUMAN  SERVICES;  THE**<br>**OFFICE   OF   THE   INSPECTOR**<br>**GENERAL FOR TEXAS HEALTH**<br>**AND  HUMAN  SERVICES  (OIG);**<br>**SYLVIA KAUFFMAN in her official**<br>**capacity      as      INSPECTOR**<br>**GENERAL   OF   OIG;   DIRK**<br>**JOHNSON in his official capacity as**<br>**CHIEF  COUNSEL  OF  OIG  and  in**<br>**his individual capacity; JENNIFER**<br>**KAUFMAN  in  her  official  capacity**<br>**as   DIRECTOR   OF   INTERNAL**<br>**AFFAIRS  OF  OIG  and  in  her**<br>**individual   capacity;   GAYLON**<br>**DACUS  in  his  official  capacity  as**<br>**SENIOR   INVESTIGATOR   FOR**<br>**OIG  and  in  his  individual  capacity;**<br>**PHYLLIS EVERETTE MOR-GAN;**<br>**JOHN/JANE DOE 1 (officially and**<br>**individually);  JOHN/JANE  DOE  2**<br>**(officially    and    individually);**<br>**JOHN/JANE  DOE  3  (officially  and**<br>**indivi-dually);   and   JOHN/JANE**<br>**DOE 4 (officially and individually)** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CASE NO. 1:22-cv-00294** |
| | § | |
|      **Defendants** | § | |

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff The Heidi Group, Inc. ("HEIDI") files this First Amended Complaint against the following Defendants: Texas Health and Human Services Commission ("HHSC"); Cecile Erwin Young in her official capacity as Commissioner of HHSC; the Office of the Inspector General for HHSC ("OIG"); Sylvia Kauffman in her official capacity as Inspector General of the OIG; Dirk Johnson in his official capacity as Chief Counsel of OIG and in his individual capacity; Jennifer Kaufman in her official capacity as Director of Internal Affairs (formerly Senior Counsel) of OIG and in her individual capacity; Gaylon Dacus in his official capacity as Senior Investigator for OIG and in his individual capacity; Phyllis Everette Morgan; John/Jane Doe 1(officially and individually); John/Jane Doe 2 (officially and individually); John/Jane Doe 3 (officially and individually); and John/Jane Doe 4 (officially and individually. This Amended Complaint is filed pursuant to leave granted by the Court in its March 30, 2023 Order adopting the Magistrate Judge's Report and Recommendations on Defendants' respective Motions for Judgment on the Pleadings (Dkt. 37).

## I.    Introduction

1.01    This case is about HEIDI's efforts to obtain redress of grievances arising out of extensive efforts undertaken by Defendants to deprive it of rights guaranteed by the Texas and United States Constitutions and in violation of Texas and federal statutes. HEIDI is a national organization with deeply-held pro-life religious views that was awarded two contracts for the provision of health services to indigent women in Texas. The Defendants are Texas agencies and bureaucrats within those agencies that resented HEIDI for it's religious pro-life views and actions,

and therefore undertook to assure that HEIDI failed. Needed and promised cooperation was withheld, computer systems were hacked and documents seized without a warrant in violation of the Texas and federal guarantees against illegal searches and seizures and Texas statutory law. The contracts were terminated based on false and defamatory allegations that arose from "investigations" employing illegal means and a predetermined ploy to punish HEIDI for its beliefs. Along the way, the Defendants deprived HEIDI of its Texas and Constitutional rights to equal protection, due process, protection against illegal searches and seizures, establishment of religion, and free exercise of religion, as well as rights protected by various Texas and federal statutes.

This case was initially filed in the 419th District Court of Travis County, Texas, but was then removed to this Court by Defendants due to the federal questions involved.

## II.    Parties

2.01    Plaintiff HEIDI is a Texas nonprofit corporation with its principal place of business in Williamson County, Texas.

2.02    Defendant HHSC is an agency within the government of the State of Texas.  It may be served through its Commissioner, Cecile Erwin Young, at its headquarters located at 4900 N. Lamar Boulevard, Austin, Texas 78751.

2.03    Defendant Cecile Erwin Young is the Commissioner of HHSC.  She is being sued in her official capacity only.  Ms. Young may be served at 4900 N. Lamar Boulevard, Austin, Texas 78751.

2.04    Defendant OIG is an independent agency within HHSC. It may be served through the Inspector General, Sylvia Kauffman, located at 11501 Burnet Rd., Bldg. 902, Austin, Texas 78758.

2.05    Defendant Sylvia Kauffman is the Inspector General of OIG.  She is being sued in her official capacity only.  She may be served at the HHSC/OIG headquarters located at 11501 Burnet Rd., Bldg. 902, Austin, Texas 78758.

2.06    Defendant Dirk Johnson is Chief Counsel of OIG.  He is being sued in both his official and individual capacities.  He may be served at his residence at 2105 McBee St., Austin, Texas 78723.

2.07    Defendant Jennifer Kaufman is Director of Internal Affairs (formerly Senior Counsel) of OIG.  She is being sued in both her official and individual capacities.  She may be served at her residence at 3604 Shady Creek Cove, Austin, Texas 78746.

2.08    Defendant Gaylon Dacus is a Senior Investigator for OIG.  He is being sued in both his official and individual capacities.  He may be served at the HHSC/OIG headquarters located at 11501 Burnet Rd., Bldg. 902, Austin, Texas 78758.

2.09    Defendant Phyllis Everette Morgan ("Phyllis Morgan") ("Everette" is no relation to Carol "Everett") is an individual who may be served at her residence at 2800 Sunrise Road, Apartment 722, Round Rock, Texas 78664.

2.10    John/Jane Doe 1 is a person whose identity is not readily known at this juncture, but who is being sued for all or part of the causes of actions stated herein.

2.11    John/Jane Doe 2 is a person whose identity is not readily known at this juncture, but who is being sued for all or part of the causes of actions stated herein.

2.12    John/Jane Doe 3 is a person whose identity is not readily known at this juncture, but who is being sued for all or part of the causes of actions stated herein.

2.13    John/Jane Doe 4 is a person whose identity is not readily known at this juncture, but who is being sued for all or part of the causes of actions stated herein.

### III.    Jurisdiction, Capacity, and Standing

3.01    The Texas District Court had subject-matter jurisdiction over this lawsuit because the amount in controversy exceeded the minimum jurisdictional limits of the Court.

3.02    The Texas Court had jurisdiction over HHSC and OIG to hear this action pursuant to the waivers of sovereign immunity found in one of the Texas statutes sued upon in this cause. Tex. Civ. Prac. & Rem. Code § 106.002.

3.03     The Texas Court further had jurisdiction over to hear this action because a court has jurisdiction to hear a declaratory judgment action to determine whether an agency exceeded its statutory authority, to obtain a declaration of a party's rights under a statute, and to determine whether an agency's action was unconstitutional. *See Texas Mun. Power Agency v. Public Util. Comm'n*, 100 S.W.3d 510, 515-16 (Tex. App.—Austin 2003, pet. denied).

3.04    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441(a) due to the federal questions involved in the case.

3.05    HEIDI has capacity to bring this suit because it is a nonprofit corporation authorized by Texas law to file suit. It has standing as the injured party to pursue the constitutional and statutory causes of action asserted herein.

### IV.    Venue

4.01    Venue for this suit was initially proper in Travis County, as all or a substantial part of the events giving rise to the claims asserted herein occurred in Travis County, Texas, and because HHSC and OIG are headquartered there.  Venue is proper in the federal Western District based on the removal of the case from Travis County District Court.

## V.    Overview

5.01    "Drain the swamp" is a battle cry heard frequently in recent national election cycles. Originally used to refer to efforts to restrain overpopulation of mosquitos and control the spread of malaria, it has more recently been used by leaders in both major political parties as a metaphor for rooting out corruption or adversaries in politics.  Nancy Pelosi used it shortly after being elected Speaker of the House in 1996 in reference to a Congress controlled by the GOP.  Presidents Reagan and Trump both used the phrase as an allusion to the need to reduce the influence of career bureaucrats in Washington, D.C., who seemed committed to thwarting the policies and agendas of national policymakers by instead following their own personal biases and dogmas. *See* https://www.dictionary.com/e/politics/drain-the-swamp/.

5.02    Texas has its own swamp.  While most Texas government employees are dedicated public servants committed to carrying out the policy directives of the State, the dedication of some seemingly goes only so far as they agree with the directives emanating from the leaders elected by the populace they are supposed to serve.   When the official policies of the State and personal convictions of bureaucratic ideologues do not align, however, some employees view their public "service" as an opportunity to subordinate the official and lawful policies of the State to their own personal and lawless power. That's what swamp creatures do.

5.03    When the Texas Legislature acted in 2011 to defund Planned Parenthood in order to minimize abortions in Texas, the reaction was predictably polarized, with pro-life supporters hailing it as a bold and morally necessary accomplishment and pro-choice activists decrying it as a disaster. Five years later when HEIDI applied to participate in abortion-free replacement women's health initiatives provided by the State, some actors within the Health and Human Services Commission – the largest of Texas' bureaucracies – discerned an opportunity to strike

back at the State's defunding of Planned Parenthood: a plot to make sure that HEIDI – believed to be the only pro-life organization participating in the programs – failed.

5.04    This case is about HEIDI's treatment at the hands of the swamp creatures, and its fight to obtain justice and to vindicate and restore its constitutional and statutory rights and entitlements.

## VI.    Background Facts

### A.    Carol Everett and the Heidi Group

6.01    Carol Everett (Everett) is a businesswoman who began her career in the abortion industry, ultimately operating several lucrative abortion clinics in Dallas.  She is now a national pro-life leader and champion for women's life-affirming health care.  In 1995, she founded The Heidi Group ("HEIDI"), eventually developing a network of pro-life medical centers to offer women meaningful alternatives to Planned Parenthood's abortion-centric model.

6.02    Everett was also instrumental in the successful efforts in 2011 for Texas to defund Planned Parenthood.  This was accomplished by attaching a rider to HHSC's budget that separated eligible entities into three tiers, in order of priority, for Title X funding. City, County, and State Health Departments had highest priority for funding, followed by Federally Qualified Health Centers and other non-profits providing women's health care. Planned Parenthood and other abortion clinics were relegated to the third tier, meaning they could only receive state funding if funds were still available after funding the first two tiers.

6.03    For her efforts, Everett may as well have painted a target on her back. Planned Parenthood and others in the pro-choice camp began looking for opportunities to destroy Everett and The Heidi Group. That opportunity presented itself in the form of the HTW and FPP programs run by the Texas Health and Human Services Commission.

**B.    Texts' HTW and FPP programs**

*1.    Background of Programs*

6.04    In 2016, the State, through the HHSC, implemented two new programs funded exclusively with State dollars: Healthy Texas Women (HTW) and Family Planning Program (FPP) (collectively referred to herein as the "Programs"), both of which were designed to provide health-care services to indigent women across Texas. This important policy move filled a gap in the State's healthcare delivery space previously occupied by federally supported Medicaid providers, many of which were abortion providers, including Planned Parenthood.

*2.    HEIDI applied to become provider*

6.05    The fact that abortion providers were not allowed to become providers under the two new Programs did not mean all providers in the Programs had to be pro-life.  Rather, providers had to sign statements saying they would not provide abortions. Therefore, clinics that previously did provide abortions could qualify by signing the requisite statement, or by creating new legal entities that would sign the statement and therefore qualify for funding. Everett desired to have an openly pro-life organization fill part of the gap left by the defunding.  Her goal in providing quality, life-affirming health care to Texas women, and those of the Legislature in creating the Programs as an alternative to abortion-supporting clinics, was natural and synergistic, but not without anticipated difficulties.  Neither Everett nor HEIDI had ever operated as a state contractor, and it was understood by both Everett and the State that there would be a learning curve and inevitable challenges as HEIDI endeavored to navigate the intricacies – and inconsistencies – of state contract compliance.  The fact that both Programs were brand new guaranteed that the difficulties would not just be on the side of HEIDI.  Moreover, the model to be used by HEIDI was unique among providers. Most others were clinics that provided healthcare services directly to patients. HEIDI's

8

model was to serve as an umbrella for a network of independent pro-life clinics and providers. Everett was assured that assistance would be both abundant and encouraged. Based on such assurances, Everett was confident in her ability to succeed in accomplishing the goals she shared with the legislative Programs.

6.06    As she later learned, not everyone shared her enthusiasm for success.

### 3.    *Contracts signed*

6.07    In the summer of 2016, HEIDI submitted proposals to participate in the State's new HTW and FPP Programs. HHSC approved HEIDI's proposals in July 2016, awarding two contracts for the delivery of health services to low-income women. HHSC signed the HTW contract in mid-July, and HEIDI immediately began work on it. The contracts were to run from signing through August 31, 2017, comprising fiscal year 2017.

6.08    For reasons that remain unexplained, HHSC failed to sign the FPP contract until January 2017, almost half-way through FY 2017, seriously hobbling HEIDI's capacity to meet that contract's substantial service requirements (including FY total-patients-served targets). This resulted in HHSC eventually adjusting HEIDI's FY 2017 requirements downward in the summer of 2017. The protracted delay in signing the FPP contract also impacted HEIDI's overall performance and its performance under the HTW contract because HEIDI had planned for simultaneous and synergistic administration of the HTW and FPP Programs. The delays in signing the FPP contract made that goal impossible and the ongoing uncertainty of when the FPP contract would be signed made implementation of the Programs difficult, inefficient, and frustrating.

### 4.    *Lack of cooperation from HHSC*

6.09    Moreover, despite substantial encouragement and assistance from "the top" (i.e., Assistant HHSC Commissioner Lesley French), HEIDI encountered substantial resistance from

the HHSC employees assigned to work with it in implementing the Programs. Among the problems were the following:

- The initial Contract Manager assigned to HEIDI's contracts either would or could not answer questions. Telephone calls and emails were generally not returned, and questions were rarely answered.
- The HHSC employee in charge of HTW and FPP billing also rarely answered questions.
- In August 2017 a new Contract Manager was assigned to HEIDI, but he did no better than his predecessor. The first and second Contract Managers and billing employee were all terminated by HHSC.
- In short, virtually no guidance was provided by HHSC, and when information was given, it was frequently false or later reversed. A general air of unwillingness to cooperate permeated the interactions with HHSC. HEIDI was generally forced to fend for itself, implementing policies and procedures as best it could considering the scant guidance it so desperately coveted, but rarely received.

6.10    Part of the problems within HHSC may have been because the Programs were new and even HHSC did not know how it should be administered, but from HEIDI's perspective it appeared to be more a lack of desire to cooperate than confusion or ignorance about how to do so. In any event, HEIDI quickly learned that the precise cooperation it acknowledged it would need to succeed in this new venture, and that it had been assured would be provided, was sorely lacking. That would not have been so deleterious to Program success if the State had been patient in working with HEIDI; but patience and cooperation are not hallmarks of the swamp, which instead subsequently seized on technical non-compliance issues to attempt to destroy HEIDI.

5.    *Contract Renewal, effective 9/1/2017 for FY 2018*

6.11    In August 2017, HHSC renewed both of HEIDI's contracts, effective September 1, 2017. Unfortunately, the administration and guidance problems that had plagued HHSC's management of the Programs in FY 2017 continued in FY 2018. Help did not arrive until April 2018 when HHSC deployed auditors from its Fiscal Monitoring Unit (FMU) to review HEIDI's

activities, which was a standard contract management practice at HHSC. Arriving with the auditors was a new HHSC Contract Manager (the third) for HEIDI. Between the FMU auditors and the new Contract Manager, questions were finally answered, and procedures were able to be implemented going forward. <u>Significantly, all of the adverse audit charges subsequently leveled by HHSC, described below, pertained to the period of time **prior** to the FMU's arrival in April 2018.</u>

C.    <u>**The FMU Audit**</u>

6.12    The FMU auditors reviewed the operations of HEIDI over the period of September 1, 2017 through April 13, 2018. Its Initial Report of Findings was issued to HEIDI on July 12, 2018 ("Initial FMU Report"). A final FMU report was issued on October 12, 2018 ("Final FMU Report"). The Final FMU Report was virtually identical to the Initial Report. (The matching findings in the two Reports are collectively referred to herein as the "FMU Findings").

6.13    The FMU Findings consisted of six enumerated findings. **All of these findings covered accounting and documentation issues solely for the portion of FY 2018 prior to the FMU field visit to HEIDI in April 2018; i.e., for the 7 ½ months of September 1, 2017 – April 13, 2018.**

6.14    The most notable FMU Finding was an erroneous assertion that a $50 reimbursement mechanism implemented by HEIDI with approval from the State was improper. The FMU auditors were initially unaware of the fact that HHSC had previously approved the $50 fee. In the spring of 2016, as Everett had prepared to submit proposals to participate in the two new Programs, she pondered how best to reimburse providers for their administrative expenses in processing patient-care claims through HEIDI to the State. The HEIDI involvement in the Programs was different from other traditional health-care providers in that HEIDI would not

provide patient services directly to indigent women but would instead function as an umbrella for many other pro-life providers. In conversations with Associate Commissioner French, Everett determined that the most efficient way to defray healthcare providers' administrative costs was to pay them a $50 administrative fee for each patient served. That method was not only efficient for the providers and HEIDI, but it was also a cost-saving device for the State because it assured that administrative costs were directly linked to medical services being provided to Texas women. French confirmed that the approach devised by HEIDI was acceptable. (She has subsequently affirmed giving this advice to Everett and her attorney.)

6.15    Everett relied on French's approval in developing HEIDI's contracting processes. Moreover, HEIDI budgeted for these costs in its State-approved budget allotments. The HHSC and the office of its internal Chief Counsel approved of this payment practice, thereby further substantiating its legal validity. Specifically, in September 2017, the HHSC and its Chief Counsel's office approved HEIDI subcontracts that detailed the $50 reimbursement process. When the FMU auditors were conducting their field work at the HEIDI's offices in April 2018, they notified HEIDI that the fee was not appropriate for several reasons, including that each $50 fee had to be broken into three separate categories and could not simply be charged as a combined administrative fee. No one at HHSC had previously said anything to HEIDI about that fee being inappropriate. Everett discussed the prior approvals HEIDI had received with the auditors and believed the matter was resolved. (This $50 fee issue was dropped in the 2021 Final Audit Report issued by the OIG auditors following its expanded audit, dated July 30, 2021. *See* Section VI-G below.)

6.16    Another of the FMU findings pertained to almost ½ million dollars in expenses and personnel/payroll costs that FMU contended should have been allocated differently between the

FPP and HTW Programs. FMU did not contend that the funds were illegitimately spent by HEIDI or that payment of those funds under the grants was not allowable; only that a different allocation methodology should have been used. (This allocation issue was dropped in the OIG's 2021 Final Audit Report, dated July 30, 2021.  *See* Section VI-G below.)

6.17    Three other minor FMU findings totaling $29,431.28 were agreed-to and repaid by HEIDI in August 2018.  (HHSC/OIG did not acknowledge this payment in its November 2019 Final Report (*See* Section VI-F, below), but it was finally acknowledged by the OIG auditors in their 2021 Final Audit Report (*See,* Section VI-G, below).

**D.**     **Contract renewal for FY 2019, then abrupt termination**

*1.*     *Renewal of HTW Contract after Initial FMU report*

6.18    Each of the foregoing issues were addressed by HEIDI and FMU during the FMU's field work in April 2018, which was prior to a new contract for FY 2019 being signed.  Following issuance of the Initial FMU Report on July 12, 2018, HEIDI and HHSC signed an amendment/renewal of the HTW Contract on July 18, 2018.  The FMU Findings were also addressed by HEIDI with HHSC in a meeting on July 30, 2018, and a similar amendment/renewal of the FPP Contract was signed by both parties on that date.  The signing of these contract renewals on July 18 and 30, 2018 was indicative of the issues having been sufficiently resolved, particularly since the complaints only covered the 7 ½-month period of September 1, 2017 – April 13, 2018, and new procedures correcting the errors pointed out by FMU had been or were being implemented.

6.19    Thus, on September 1, 2018, HEIDI began the new 2019 fiscal year with two renewed 12-month contracts with HHSC, whereby it continued to deliver healthcare services to indigent women across Texas. In renewing the contracts, the State took no further action regarding

the FMU report, nor did it voice any additional concerns regarding HEIDI's past performance. Unbeknownst to HEIDI, however, not all elements within HHSC were pleased with the HEIDI renewal, and the covert efforts to undermine HEIDI accelerated. The swamp continued to use the seemingly resolved "Findings," particularly the $50 fee issue, as the primary hammer to defame HEIDI, terminate the Contracts, and, in its November 2019 Final Report – s*ee* Section VI-F, below –, falsely suggest fraud and determine that large repayment amounts were owed by HEIDI. It wasn't until OIG's 2021 Final Audit – see Section VI-G, below – that these issues were dropped, and the 2019 Final Report was withdrawn. The 2021 Final Audit also acknowledged that HHSC was at least partially to blame for the FMU issues based on its own control weaknesses. Specifically, the Final Audit noted that former HHSC program oversight personnel had not identified or addressed issues with HEIDI's invoice documentation, with the result that those issues went undetected until FMU's on-site reviews in April 2018. Unfortunately, the 2021 Report was almost three years after HEIDI's contracts had been terminated, in large part due to the pre-April 2018 issues HHSC had failed to detect and for which it had refused to provide needed and requested guidance.

### 2.    *Texas Observer hit piece*

6.20    On September 26, 2018, less than a month into HEIDI's renewed FY 2019 Contracts, The *Texas Observer,* a bimonthly progressive publication, printed an extremely critical hit-piece attacking Carol Everett and HEIDI. The most damaging allegation in the story was the false report that HEIDI treated only 3300 patients in FY 2017, which served as the article's headline. That egregiously incorrect number, tantamount to imputing fraud, was far removed from the truth. On information and belief, portions of the false information stated in said article were provided by HHSC personnel as part of their intentional discrimination against HEIDI for its pro-

life religious beliefs. (Ironically, and presciently, the author of the *Observer* article had told Everett that she could not succeed because if she did, Planned Parenthood would not be able to get money. She warned that Everett would fail and would be discredited.)

6.21    A subsequent HEIDI internal review, supported by detailed patient-visit records submitted by HEIDI's medical providers, revealed that HEIDI served more than triple that number. In fact, HEIDI had been expressly instructed by HHSC to report lower than factual numbers because the reporting had to match what was in HHSC's data, which was lower because HHSC still had not entered many of HEIDI's providers into its system. Unfortunately, also on September 26, *The Dallas Morning News* mainstreamed the *Observer's* false allegations, reprinting the article virtually in full.

### 3.    *Termination of Contracts on 10/12/18*

6.22    In the wake of these professionally damaging and personally defamatory publications, HEIDI received no communication nor any sign of concern from HHSC officials. HHSC issued no public statement responding to the stories nor did it emit any internal signal of discontent with HEIDI's performance. However, on October 12, 2018, HHSC precipitously terminated (for "convenience") both of HEIDI's Contracts. At the time, it appeared to HEIDI that the terminations were just a knee-jerk reaction to the *Texas Observer* hit piece. HEIDI subsequently learned that the *Texas Observer* article was at most a pretext for the terminations, which were in reality the culmination of efforts already underway by forces within HHSC/OIG to terminate the Contracts and destroy HEIDI as a national force in the pro-life movement. These efforts included:

> (1) In July/August 2018, at the very time HEIDI was being approved for a new FY 2019 contract renewal, Defendant Gaylon Dacus and others within HHSC/OIG began colluding with Defendant Phyllis Morgan – a disgruntled former HEIDI employee – to compile alleged "dirt" on Everett and HEIDI while illegally

obtaining HEIDI documents via cybersecurity crimes in violation of Texas Penal Code §33.02 and 18 U.S.C. 1030.  (*See* Sections VI-E and F and VII-A(2), B-2, and D, below.)

(2) Also in July 2018, forces within HHSC/OIG began "investigating" HEIDI in a highly unusual manner.  Ordinarily, contract compliance and performance disputes with external vendors (such as HEIDI) are handled by HHSC within its own Chief Counsel division, while claims of fraud, waste, or abuse (none of which had ever been alleged against HEIDI) are referred to HHSC's Office of Inspector General (OIG).  Yet this investigation into a vendor contracting issue was anomalously conducted by the OIG.  Even more unusual, the investigative division within OIG conducting the investigation was "Internal Affairs" instead of the medical provider investigative division. The purpose of "Internal Affairs," according to OIG's own website, is to "investigate[] employee misconduct in the provision of health and human services, including contract fraud within the HHS system."  HEIDI was not an employee nor even "within" the HHS system but was an external contractor. As noted above, such issues were typically handled outside of OIG by HHSC's own Chief Counsel office.  The reason for the investigation being conducted by OIG and its Internal Affairs division is explained by an anonymous communication HEIDI's attorney received warning about an oppressive pro-choice ideological bias against HEIDI within HHSC/OIG. (*See* Section VI-F, below.)

(3) The HHSC/OIG investigation that began in July 2018 resulted in a defamatory and highly erroneous November 2019 Final Report, which in turn led to a new full audit that continued for another 19 months.  The 2019 Final Report is addressed in Section VI-F below.  The 2021 Final Audit report from the new audit is addressed in Section VI-G below.

6.23    The October 12, 2018 contract terminations were undertaken as part of an intentional plot from within HHSC/OIG to discriminate against HEIDI for its pro-life religious beliefs. When Associate Commissioner French called Everett the afternoon of October 12, 2018, she simply stated that HEIDI's Contracts were terminated, giving no reason.  She subsequently confirmed to Everett that there had been an internal plot for HEIDI to fail. She also confirmed that she believed HEIDI was performing adequately in the fall of 2018, that prior issues of concern had been fully addressed during the contract renewal process, and that most of the vendors in the new HTW and FPP Programs had experienced challenges like those experienced by HEIDI.  French would know because she was the Associate Commissioner for HHSC in charge of the two Programs.

6.24    Further evidencing that the terminations were the result of a plot from within HHSC/OIG instead of just a peremptory reaction to the *Texas Observer* article was the way HHSC announced the terminations. Despite ostensibly terminating "for convenience," HHSC's spokesperson publicly treated HEIDI's terminations as if they were "for cause," issuing a statement on the evening of October 12, 2018, noting that, "[t]he Heidi Group has had substantial deficiencies in the areas of contract compliance, service administration, and financial and administration management of both contracts." But those issues had been addressed during the contract renewal process two months earlier, resulting in the renewal of both HEIDI contracts.  No new irregularities or complaints occurred after the inception of HEIDI's FY 2019 contractual work on September 1, 2018. Indeed, nothing adverse had occurred between the decision to renew the contracts in July 2018 and the terminations on October 12, 2018 except (1) the September 26 libelous hit piece published by an ideologically-driven media outlet, (2) the conspiracy between HHSC/OIG officials and Phyllis Morgan to collect dirt on Everett and HEIDI (regardless of whether true) and to illegally access HEIDI files and records, and (3) the surreptitious efforts by HHSC/OIG officials to undermine HEIDI's newly renewed contracts.

**E.    Illegal collusion between OIG and Phyllis Morgan**

6.25    Phyllis Morgan began work at HEIDI on September 7, 2017. Carol Everett, CEO of HEIDI, hired Morgan as Program Director, a position of significant responsibility. HEIDI was just a year into its two contracts with the State to provide healthcare services for indigent women.

6.26    Morgan significantly underperformed, resulting in her reassignment to positions of less responsibility. She failed to thrive and was terminated by Everett on July 9, 2018. Upon termination, Morgan became extremely hostile and threatening. Almost immediately after departing HEIDI, Morgan visited the OIG to begin what became a vengeful campaign of

retribution, based on libel and slander, against Everett and HEIDI. That campaign drastically and quickly veered into criminal conduct that was abetted by investigators within OIG, who conspired with Morgan to commit such criminal acts.

6.27    The criminal conduct began in July 2018 when Morgan unlawfully intruded into HEIDI computer files. Immediately after being terminated by HEIDI, she began regularly visiting and/or communicating with OIG investigators. As described in greater detail below, she conspired with Defendant Dacus, a senior OIG investigator, to provide him with information she told him she could still obtain from HEIDI's computers, even though she was no longer employed by HEIDI. Then, on numerous occasions from July 2018 through March 2019, she fed illegally obtained documents and information to Dacus, who encouraged such activity and even said it was "much appreciated."

6.28    Morgan's illegal postemployment accessing of HEIDI files was prohibited by HEIDI policies, to which Morgan assented upon employment, and was illegal under Texas law. Troublingly, Dacus, a career law enforcement investigator, did not express any apparent concern to Morgan that she was unlawfully accessing HEIDI files. Indeed, he encouraged her help and conspired with her in that regard.

6.29    On May 21, 2019, Morgan again accessed HEIDI files, but this time she altered some of them, which elicited a warning notice to HEIDI's administrator. Upon discovering that Morgan had illegally accessed HEIDI's Drop Box files, the administrator deleted her access and HEIDI notified the Round Rock Police Department of Morgan's illegal intrusion. Prior to January 2021, this intrusion was the only incident of Morgan's illegal access of HEIDI's computer system known to HEIDI

6.30    Detective Brian Neveu of the RRPD was assigned to the case and, after visiting with HEIDI staff and securing evidence of Morgan's illegal intrusion, he interviewed her on August 4, 2019. During the interview, Morgan admitted accessing HEIDI files after her termination. Although Morgan initially stated that she had not provided anything to the OIG, she changed her story when confronted by Neveu with evidence to the contrary. Morgan then acknowledged that she had provided "everything to the state," including illegally seized files. She told Neveu that "everybody at the State" knew that she had access to HEIDI's Drop Box.

6.31    On October 24, 2019, Morgan was arrested, booked, and released on bail for the crime of Computer Security Breach. Inexplicably, the Williamson County Attorney decided not to pursue prosecution, despite Morgan's unequivocal confession to Neveu.

6.32    It was not until January 2021, when documents were finally received from the Round Rock Police Department pursuant to an Open Records request, that HEIDI discovered that State operatives had been colluding with Morgan in prior illegal computer intrusions between July 2018 and March 2019.

6.33    Aggravating all of this, someone anonymously created a false email account (later tracked to Utah) that mimicked Carol Everett's HEIDI account and began sending fraudulent emails alleging illegal fund transfers by Ms. Everett. On information and belief, Defendant Morgan was involved with this false email account.

6.34    During this time, it was discovered that the HEIDI offices had been "bugged." When the listening device was discovered, Everett called the police.  While on the phone reporting the incident, four individuals claiming to be with the FBI – but apparently instead the perpetrators attempting to cover the tracks that they could hear had been discovered – showed up at the HEIDI offices and "retrieved" the listening device.  HEIDI later learned it was not the FBI.

**F.** **OIG Investigation and 2019 Final Report**

6.35    When HHSC terminated HEIDI's contracts, it announced that it was referring the matter to OIG for a formal investigation.  By that time, however, the zealots at OIG were already deeply involved in their illegal collusion with Phyllis Morgan.

6.36    Morgan was terminated by HEIDI on July 9, 2018. Within just a couple of days after she was fired, Morgan began communicating with HHSC about her baseless claims against HEIDI and her ability to provide information and documents that she claimed supported her accusations. Two days after Morgan was fired, July 11, 2018, HHSC/OIG opened its investigation, which the November 2019 Final Report says was opened that day based on an "Anonymous" complainant. That complainant was undoubtedly Morgan. The next day, July 12, 2019, an HHSC employee emailed Morgan, giving her the contact information for OIG based on "the nature of our *earlier* telephone and email communications."   (Emphasis added.) That led to her contacting Defendant Dacus and others at HHSC/OIG who collectively hatched a plot for her to assist them by illegally accessing and copying documents and information from HEIDI's computer and computer system. Morgan had informed Dacus, and others at HHSC/OIG that she had access to HEIDI's DropBox account even though she had been terminated from HEIDI. Under the agreement, Morgan would access HEIDI's DropBox account to download and/or copy confidential and proprietary documents, including correspondence, accounting records, and reports. She would then provide them to HHSC/OIG for use in its investigation of HEIDI.

6.37    In accordance with the plot, Morgan illegally accessed HEIDI's computer accounts on numerous occasions. On many of these occasions she downloaded documents or otherwise acquired information. Even worse, she deleted numerous files and modified others. An investigatory report by the Round Rock Police Department found that Morgan "entered or

modified 34 different files or folders since she left [HEIDI] employment on 7/9/2018." The report also showed that Morgan deleted numerous HEIDI files and folders during that same time period.

6.38    Morgan kept her agreement to provide information she acquired from HEIDI's computers to HHSC/OIG. The first documents and information were given to Dacus on and before August 22, 2018. On that date Morgan emailed him that she had "more information to send" him, and then attached other "supporting documents." That email also confirmed the agreement previously reached between Morgan and Dacus: "You mentioned that if I were to get more information to send [sic.] you so that the organization can appropriately evaluate the spending within the organization and the misuse of taxpayer dollars." Upon sending Dacus that additional information, Dacus confirmed receipt and appreciation by emailing Morgan that same day: "Thank you for the additional information. Much appreciated."

6.39    On December 4, 2018, Dacus emailed Morgan asking whether "someone at HEIDI accidentally link[ed] your account to theirs" and asking her to confirm that she "still" had "access to all their information." Morgan responded that same day: "Perhaps Brad linked me – then forgot to remove me. I am not sure…didn't ask. However, it clearly states you can see I have access to their admin Box I have access [sic.]" She then attached thumbnails of some of the items, including "Budget 2018," "Budget 2018 final," other budgetary information and worksheets, and emphasized that she even had access to patient records.

6.40    On March 18, 2019, Morgan sent Dacus and others at HHSC/OIG copies of HEIDI personnel paychecks along with an email reiterating that "since July 2018" she had "access to all the Heidi Groups [sic.] current financials and also current confidential patient information." She also noted that "Since July of 18, I reported and submitted large amounts of documentation" regarding her allegations of "the misuse of finance and seemingly fraudulent, unethical behaviors."

6.41    The Round Rock Police Department Investigation Report noted that a comparison of the "DropBox files that [Morgan] accessed . . . to information she sent to the State" revealed that "several documents were found in both locations."  Neither Dacus nor HHSC/OIG nor anyone else had a search warrant for the access to the HEIDI document files.

6.42    In March 2019, HEIDI received an HHSC/OIG Request for Information related to the FMU findings (i.e., the $50 payment process to defray administrative costs, cost allocations between the programs, and HEIDI's payroll).  At that time, HEIDI had no knowledge of Morgan's cybersecurity crimes or of her conspiratorial collusion with HHSC/OIG.   Substantial files and records had already been delivered by Morgan to Dacus.  Most of the documents requested in the new investigation had also already been provided by HEIDI to HHSC in connection with the ongoing contract performance and to the FMU auditors in connection with their audit prior to the Contract terminations. Nevertheless, on April 4, 2019, HEIDI met with HHSC/OIG investigators at HEIDI's Williamson County office and provided numerous responsive documents to HHSC/OIG investigators, as well as myriad details on the actual number of patients seen by HEIDI, much higher than the numbers published in the press. At the conclusion of the April 4 meeting, the HHSC/OIG's lead investigator indicated that Carol Everett would be interviewed at some point during the investigation.  That never happened. She was not interviewed until July 2020, long after the investigation was concluded, the November 2019 Final Report (discussed below) had been issued, and yet a new audit had begun.

6.43    Except for one follow-up visit to pick up additional documents, HEIDI did not again hear from the HHSC/OIG for seven months, despite several attempts by HEIDI's attorney to contact HHSC/OIG's Chief Counsel. In the interim, HEIDI learned that HHSC/OIG staff had interviewed a number of disgruntled former HEIDI employees, including Morgan.

6.44    The OIG "investigation" lasted 13 months after the Contracts were terminated; 16 months after the conspiracy with Morgan began.  On November 7, 2019, HEIDI's attorney received a call from the HHSC/OIG's Chief Counsel, Defendant Dirk Johnson.  Johnson initially said he would finally like to meet, but then offhandedly observed that he had a final report (the "November 2019 Final Report," or just "2019 Final Report") on HEIDI's investigation ready for release. When asked why Everett had not been interviewed, since she was the investigation's primary subject, he said, "It wasn't necessary." Johnson further observed that the report was "derived chiefly from document review;" however, a number of people were interviewed by HHSC/OIG investigators, including many former HEIDI employees. Johnson also acknowledged that the HHSC/OIG had hired an outside forensic auditor for this internal investigation, another curiously abnormal move. These facts further evidence HHSC and OIG bias against HEIDI, including the bias of OIG chief counsel Johnson.

6.45    The 2019 Final Report was fait accompli; a pre-determined rubber-stamp of the FMU Findings with little new analysis and no mention of the explanations given by HEIDI to the major Findings – such as that the $50 administrative fee had been approved by Assistant Commissioner French and the HHSC Office of General Counsel – or even of the fact that HEIDI had long-previously acknowledged and repaid the three minor findings, in the total amount of $29,431.28.  The Report did not expressly allege that HEIDI engaged in fraud, waste, or abuse, though fraud was strongly implied. Instead, it repeated the identical amounts that the Final FMU Report of October 12, 2018 had claimed were improper and/or unsupported, which in turn had repeated virtually verbatim (except for minor calculation errors) the amounts contained in the Initial FMU Report of July 12, 2018. The 2019 Final Report did, however, add two additional

unsupported financial penalties called "Audit Team's Estimate," which amounted to almost $340,000. The HHSC/OIG's auditors were unable to explain the bases for these additive estimates.

6.46    Significantly, as had been the case with the FMU Findings it mirrored, the 2019 Final Report also dealt almost exclusively with the 7½–month period of September 1, 2017 through April 13, 2018, a period during which HHSC failed to provide needed feedback and guidance to HEIDI, as finally acknowledged by HHSC/OIG in its 2021 Final Report. (*See* Section VI-F and G, below.)

6.47    The 2019 Final Report did go beyond the FMU findings in one aspect. It states that HEIDI made payments to four professionals that were questionable. Specifically, it questioned payments to two Medical Directors (one over the Programs and one over HEIDI itself), a CPA, and an accounting consultant. The Report did not find any wrongdoing with respect to those payments, but did recommend that the scope of review in the final audit (*see* Section VI-F, below) be expanded to determine if professional services were provided for the paid fees.  That component of the 2019 Final Report appears to be related to illegally obtained information fed by Morgan to HHSC/OIG. On March 18, 2019, Morgan ranted about payments to various professionals, including the same two Medical Directors mentioned in the 2019 Final Report. Morgan attached illegally obtained copies of checks to those professionals. (The 2021 Final Audit did not find anything aberrant or wrongful with those payments.)

6.48    During its investigation, HHSC/OIG failed to interview HEIDI's CEO, Carol Everett, the investigation's primary subject, despite representations that it would. This failure, along with the other intentional actions taken against HEIDI (including the collusion with Morgan in connection with the unlawful cybersecurity intrusions detailed above), breached Everett's

constitutional rights to due process under Texas and federal law. The swamp does not care about due process.

6.49    The collusion and the biased, one-sided, fervent efforts on the part of HHSC/OIG to destroy HEIDI can be explained by an anonymous letter received by HEIDI's attorney in July 2019. It stated, in pertinent part:

> The two top lawyers at the IG are leaking info to the media and legislators about the Heidi Group investigation.  Somehow two big Democrat donors ended up heading legal for the IG, both donors to planned Parenthood and other far left candidates and pacs. Dirk Johnson, General Counsel and Jen Kaufman, senior counsel are both major liberals who shouldn't have been allowed near the case. Kaufman's husband is a huge liberal donor in Austin and is over the Internal Affairs group heading up the investigation. Jen Kaufman was overhead [sic.] discussing key investigative information with a reporter from Austin American statesman.

6.50    The 2019 Final Report concluded that over $1.5 million was owed by HEIDI for the period in question and noted that the investigation was being expanded to cover the entirety of the Contracts' duration.

## G.    OIG Expanded Audit and 2021 Final Audit Report

6.51    In December 2019, shortly after the fallacious and defamatory 2019 Final Report was released, HHSC/OIG began a new audit of HEIDI covering the full contract period for both of HEIDI's contracts with the State. At the audit entrance conference, HHSC/OIG's chief auditor inexplicably indicated to Everett and her attorney that she believed HEIDI's contracts were still active, despite having been terminated over a year earlier.  Moreover, the outside forensic auditor previously contracted to assist with the internal investigation was present at the entrance conference, having then been hired as a full-time HHSC/OIG employee; HHSC/OIG assigned that forensic auditor to lead the new HEIDI audit-work.

6.52    This assignment violated generally accepted government auditing standards (GAGAS) promulgated by Government Accountability Office in its Yellow Book (the national

public sector auditor's rulebook). GAGAS requires all auditors on an audit be *independent* (that is, they must have had no prior engagement or experience with the subject matter of the audit). A senior GAO auditor opined to HEIDI's attorney that what the HHSC/OIG was doing appeared to violate the Yellow Book's independence requirements. HEIDI complained of this violation, and the HHSC/OIG replaced the lead auditor (the former outside forensic auditor/contractor) without acknowledging error.

6.53    The new audit lasted 19 months. That was on top of the initial audits and investigation that lasted 20 months, meaning HEIDI was subjected to 39 months of largely frivolous audits, which drained HEIDI of incredible amounts of time, money, energy, and resources. During this same time, HEIDI's revenues were mostly eliminated due to the October 12, 2018 contract terminations. Moreover, HHSC's October 12, 2018 announcement implying that the terminations were for cause, combined with the November 2019 Final Report's implication of fraud all assured that HEIDI's donor base virtually dried up. The ongoing audit expenses and concomitant cessation of revenues has put HEIDI on the brink of ruin.

6.54    On July 30, 2021, the OIG's auditors released their new Audit Report ("2021 Audit Report").   Unlike the November 2019 Final Report that was issued without Everett being interviewed, the 2021 Audit Report was issued after a series of meetings with HEIDI and Everett, who were able to respond to questions and issues raised by the auditors. The results are telling. The November 2019 report covering just HEIDI's performance during the 7½ months from September 1, 2017 through April 13, 2018 concluded with implications of fraud and a finding that HEIDI "owes the state" over $1.56 million.   By contrast, the 2021 Report covering the entire contract period (July 15, 2016 – December 11, 2018, which subsumed the original 7½-month period) concluded that a *total* of only $136,755.42 in unallowable or inadequately supported costs

had been billed by HEIDI. Significantly, it did not substantiate virtually any of the $1.56 million described in the 2019 Audit Report. The new total was less than 3% of the total amount expended by HEIDI in its two contracts with the state. Moreover, this amount was the result of bookkeeping and accounting deficiencies, not any nefarious plot on the part of HEIDI to defraud as was inferred by the 2019 Final Report. Indeed, the 2021 Audit Report expressly stated that the OIG auditors "did not find evidence of fraud during the course of this audit or during its investigation."

6.55    The 2021 Audit Report also acknowledged that the causes underlying its assessment included poor "contract oversight" by the state, which was a product of HHSC's failure to provide HEIDI with adequate program training and guidance. HEIDI's own financial controls reflected, as the Report notes, significant weaknesses, especially during the initial stages of the HTW and FPP Programs. But that was most certainly the case with every vendor in the Programs, symptomatic of the fact that both Programs were "start-ups." HEIDI knew about its own inexperience in the field going in and relied heavily on the promised assurances it had received that support and guidance would be readily available. To its credit, the 2021 Audit Report acknowledges that such support and guidance was not provided. Rather, "control weaknesses in HHSC's contract oversight existed by former HHSC program oversight personnel [who] did not address weaknesses in invoice documentation submitted by the Heidi Group . . .. As a result, those weaknesses went undetected until HHSC's Fiscal Monitoring Unit ["FMU"] conducted on-site reviews in April 2018." However, what the auditors chalked up to HHSC "control weaknesses" was in reality a reflection of the bias that permeated HHSC against HEIDI for its pro-life religious beliefs. That bias became inflamed after the collusion began between Morgan and HHSC/OIG. The unfounded rantings of Morgan fit neatly into the biased narrative of Dacus, Johnson, Jennifer Kaufman, and the others at HHSC/OIG. The lack of cooperation by the HHSC personnel early

on provided the excuse needed by the HHSC/OIG zealots to terminate and excoriate HEIDI and Everett. The new opportunities granted by the renewed contracts were quickly snatched away, followed by the public and leaked comments and the implications of fraud and million-dollar liability in the 2019 Final Report, which were undoubtedly intended to be the final nails in the HEIDI coffin.

6.56    The 2021 Report concluded that "Based on the totality of the circumstances, OIG is not seeking a recovery from the Heidi Group" for any of the $136,755.42 of unallowable or inadequately supported costs.

**H.    Unknown Actors Remain to be Identified:**

6.57    HEIDI has named Defendants John/Jane Doe 1, John/Jane Doe 2, John/Jane Doe 3, and John/Jane Doe 4, as, on information and belief, other unknown State actors within HHSC and OIG who participated in the discrimination towards HEIDI outlined in this Petition. HEIDI intends to add such persons to this lawsuit once identified through this litigation.

## VII.    Causes of Action

**A.    Count I: Violation of Texas Constitutional Rights[1]**

7.01    HEIDI incorporates all the foregoing and succeeding paragraphs herein to the extent not inconsistent herewith. HEIDI would further show as follows:

7.02    This cause of action is asserted against Defendants Young, Sylvia Kauffman, Johnson, Jennifer Kaufman, Dacus, and the John/Jane Doe Defendants in their respective official capacities for HHSC and OIG (collectively referred to herein as the "Official Capacity

---

[1] The Magistrate's Report and Recommendation stated that "the court's analysis does not reach Heidi's stand-alone state constitutional claims" though the federal constitutional claims had to be repleaded under 28 U.S.C. §1983 or they were otherwise dismissed. Accordingly, Heidi's federal constitutional claims are removed from this section and repleaded under Section VII-B, *infra*. Dkt. 30 at n.7.

Defendants" or the "Officers"). Defendant Morgan is also a defendant under Section VII-A(2) herein.

7.03    The Texas Declaratory Judgment Act ("DJA") is set forth in Chapter 37 of the Texas Civil Practice and Remedies Code ("CPRC"). It is a remedial enactment that allows courts to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Tex. Civ. Prac. & Rem. Code § 37.002(b). More specifically, a court "has power to declare rights, status, and other legal relations." Id. § 37.003(a). A person "whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *Id*. § 37.004(a).  The Texas DJA may be used "to require state officials to comply with statutory or constitutional provisions [and] are not prohibited by sovereign immunity."  *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).  HEIDI is a "person" within the meaning of Texas DJA § 37.001 and is therefore entitled to bring a declaratory judgment action.

7.04    Since this case was removed to federal court, HEIDI's Texas DJA claims are construed under the federal DJA.[2]  But unlike HEIDI's federal constitutional causes of action, Heidi's state constitutional claims do not need to be asserted under Section 1983. In fact, state claims *cannot* be asserted under Section 1983, which applies only to violations of *federal* law. Moreover, while the federal DJA "is a procedural device that does not create a cause of action,"[3] both the Texas and federal DJA's in this case would be used to construe causes of action already in existence. Specifically, the Texas Supreme Court has recognized that "suits for *equitable remedies* for violation of constitutional rights" are permitted under the Texas Constitution. *City of*

---

[2] Magistrate's Report and Recommendation, Dkt. 30, p.7.
[3] *Id*.

*Beaumont v. Bouillion*, 896 S.W.2d 143, 148-49 (Tex. 1995) ("[T]he State has no power to commit acts contrary to the guarantees found in the [Texas] Bill of Rights" and, therefore, "any provision of the Bill of Rights is self-executing to the extent that anything done in violation of it is void. . . . Thus, suits for equitable remedies for violation of constitutional rights are not prohibited."). Accordingly, HEIDI's claims herein for violation of its rights under the Texas Constitution, in which it seeks only equitable remedies, is appropriately construed under the federal DJA.

7.05    As outlined in this Petition, the actions of the Official Capacity Defendants amount to substantial ultra vires violations of HEIDI's Texas constitutional rights. These violations did not involve the exercise of discretion by the Officers, who instead acted without legal authority and in direct contravention of the non-discretionary constitutional provisions they were obligated to follow. They are not entitled to official immunity because (a) they were not performing discretionary duties but instead had no discretion to deprive HEIDI of its constitutional rights and privileges and (b) they did not act in good faith. They are not entitled to qualified immunity because (a) they were not exercising discretionary functions and (b) they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." The Official Capacity Defendants' violations include the following:

     *1.*    ***Equal Protection Clause***

7.06    Article 1, Sections 3 and 3a of the Texas Constitution entitles persons to equal protection of the laws. Specifically, Article 1, Sections 3 and 3a state:

> 3. All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

> 3a. Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

Tex. Const. Art. 1, §§ 3, 3a.

7.07    Texas courts have held that to assert an equal rights claim under article 1, section 3, of the Texas Constitution, a claimant must allege that it was treated differently from other, similarly situated parties, without a reasonable basis." *City of Houston v. Downstream Envtl., LLC*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).  As described in this Petition, HEIDI was singularly subjected to intrusive harassment by HHSC and OIG, including unlawful search and seizure, bias-based contract terminations, unending audits, and the other actions described above, unlike any other program participant.  Moreover, there was no reasonable basis for HEIDI's disparate treatment at the hands of State.  HEIDI was subjected to such treatment because of its pro-life beliefs.  Such discrimination at a minimum violates the Texas Constitution's express prohibition from discrimination based on "creed," which grants protection to those with common beliefs.  *See Ramos v. State*, 934 S.W.2d 358, 368 (Tex. Crim. App. 1996) (discussing Section 3a, noting that "'creed' is a suspect classification under the Equal Rights Amendment," and further noting that "the word at least signifies common beliefs.").

7.08    Accordingly, HEIDI now seeks a declaration that the Official Capacity Defendants, acting on behalf of HHSC and OIG, violated its constitutional right to equal protection enshrined in the Texas Constitution, and further seeks equitable relief enjoining further violation thereof, a prospective mandatory injunction or other equitable order restoring HEIDI to its pre-contract termination position as an active member of the Programs, and an order compelling HHSC and OIG to issue a statement retracting their public criticism of HEIDI.

2.    ***Freedom from Illegal Searches and Seizures***

7.09    The Texas Constitution protects persons from "unreasonable seizures or searches" of property "without probable cause, supported by oath or affirmation."  TEX. CONST. Art. 1, § 9. Dacus and, on information and belief, the other Official Capacity Defendants, in conspiratorial

collusion with Defendant Morgan, and by abetting Morgan's unlawful computer intrusions into HEIDI's computers and computer system, illegally searched and seized HEIDI property, without probable cause supported by oath or affirmation. After such search and seizure, these Official Capacity Defendants, acting on behalf of HHSC and OIG, have used, and continue to use, such information against HEIDI. Such actions are in violation of HEIDI's constitutional right to be free from illegal search and seizure.

7.10    As discussed *infra* at Section VII-B(2), Defendant Morgan acted as a de facto agent of the State through her conspiracy with the Official Capacity Defendants. Therefore, her unconstitutional actions are imputed to the State and warrant the declaratory relief set forth below.

7.11    Accordingly, HEIDI now seeks a declaration that some or all of the Official Capacity Defendants and Morgan violated HEIDI's constitutional rights to freedom from illegal search and seizure as enshrined in the Texas Constitution, and further seeks equitable relief enjoining further violations thereof, a prospective mandatory injunction or other equitable order restoring HEIDI to its pre-contract termination position as an active member of the Programs, and an order compelling HHSC and OIG to issue a statement retracting their public criticism of HEIDI.

*3.    Due Process Clause*

7.12    The Texas Constitution protects persons from deprivation by the State of "life, liberty or property" without "due course" of law. TEX. CONST. Art. 1, § 19. This section of the Texas Constitution further protects against deprivation of "privileges or immunities."

7.13    The Official Capacity Defendants took actions that deprived HEIDI of property, privileges, and immunities without due course of law. As detailed *supra*, they embarked on an extensive and nefarious plot to terminate HEIDI's contractual rights and destroy its reputation and business. And while the entire course of treatment reflects an utter disregard for HEIDI's due

process rights, the fact that the "investigators" refused to give Everett an opportunity to even respond to the allegations before striking mortal blows is especially alarming from a due process standpoint.  For example, in their November 2019 Final Report, HHSC and OIG rendered decisions against HEIDI with virtually no process at all—including no hearing or even an interview with Everett.  The State used its power to unilaterally destroy HEIDI without it even having the opportunity to state its case.  As stated *supra*, "[t]he swamp does not care about due process." Courts, however, do.

7.14    Accordingly, HEIDI now seeks a declaration that the Official Capacity Defendants, acting on behalf of HHSC and OIG, violated HEIDI's constitutional rights to due process as enshrined in the Texas Constitution, and further seeks equitable relief enjoining further violation thereof, a prospective mandatory injunction or other equitable order restoring HEIDI to its pre-contract termination position as an active member of the Programs, and an order compelling HHSC and OIG to issue a statement retracting their public criticism of HEIDI.

### *4.    Establishment Clause*

7.15    Article 1, Section 6 of the Texas Constitution precludes the State from acting in preference against or for any religious society or worship:

> No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship.

TEX. CONST. Art. 1, § 6.

7.16    As detailed in this Petition, the Official Capacity Defendants, acting on behalf of HHSC and OIG, intentionally targeted and discriminated against HEIDI due to its pro-life religious beliefs.  They took such actions to hinder HEIDI's ability to provide pro-life guidance in accordance with its pro-life religious beliefs. In doing so, the Official Capacity Defendants took actions antagonistic to HEIDI's pro-life religious beliefs, conveyed a message disfavoring such

beliefs, and punished HEIDI for embracing and championing such beliefs, all in violation of Article 1, section 6 of the Texas Constitution.

7.17     Accordingly, HEIDI now seeks a declaration that the Official Capacity Defendants, acting on behalf of HHSC and OIG, violated HEIDI's constitutional rights under the Texas Constitution to have, embrace, and advocate its pro-life religious beliefs, and further seeks equitable relief enjoining further violation thereof, a prospective mandatory injunction or other equitable order restoring HEIDI to its pre-contract termination position as an active member of the Programs, and an order compelling HHSC and OIG to issue a statement retracting their public criticism of HEIDI.

**B.     Count II: Federal Civil Rights Act Violations, 42 U.S.C. Sec. 1983:**

7.18     HEIDI incorporates all the foregoing and succeeding paragraphs herein to the extent not inconsistent herewith.  HEIDI would further show as follows:

7.19     The Defendants to this § 1983 Claim are Defendants (a) Morgan (only with respect to the Fourth Amendment claim), (b) the Official Capacity Defendants (Young, Sylvia Kauffman, Johnson, Jennifer Kaufman, Dacus, and the John/Jane Doe Defendants in their official capacities), and (c) Johnson, Jennifer Kaufman, Dacus, and the John/Jane Doe Defendants in their individual capacities (all collectively referred to herein as the "§ 1983 Defendants").

**1.     _Section 1983_:**

7.20     The federal Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  The two elements necessary to prove a claim under § 1983 are: The plaintiff must prove (1) that the defendant has deprived him of a right secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this constitutional right under color of law.  *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150 (1970). HEIDI is a person within the meaning of the foregoing, that has been deprived of rights, privileges, or immunities secured by the United States Constitution and laws by Defendants, all of whom acted under color of law in connection with the deprivations described below.

7.21    The actions of the § 1983 Defendants amount to substantial violations of HEIDI's constitutional rights that did not involve the exercise of discretion by these Defendants. Rather, they acted without legal authority and in direct contravention of the non-discretionary constitutional provisions they were obligated to follow. They are not entitled to official immunity because (a) they were not performing discretionary duties but instead had no discretion to deprive HEIDI of its constitutional rights and privileges and (b) they did not act in good faith.  They are not entitled to qualified immunity because (a) they were not exercising discretionary functions and (b) they violated "clearly established statutory or constitutional rights of which a reasonable person would have known."

2.    ***Deprivation of Rights Secured by the Fourth Amendment***:

7.22    The Fourth Amendment to the United States Constitution protects persons from "unreasonable searches and seizures" of property without "probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. 4.  Morgan and the other § 1983 Defendants engaged in a civil conspiracy to deprive HEIDI of its right under the Fourth Amendment to the United States

Constitution to be free from illegal searches and seizures. These deprivations were committed under color of law.

7.23     The Supreme Court surveyed the "well-established common law of civil conspiracy" in *Beck v. Prupis*, 529 U.S. 494, 500 (2000). To establish a conspiracy, a plaintiff must show both concerted action and actual acts of a tortious character. *Id.* at 501-02. Conspiracy is a "mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act." *Id.* at 503. "An alleged conspiracy by or agreement between the defendants is not of itself actionable. Some wrongful act to the plaintiff's damage must have been done by one or more of the defendants, and the fact of a conspiracy merely bears on the liability of the various defendants as joint tort-feasors." *Id.*

7.24     From July 2018 through March 2019, Defendants Morgan, Dacus, and others at HHSC/OIG carried out an agreed plan to unlawfully intrude into HEIDI's computer and computer system without a search warrant. Under the agreement, Morgan would access HEIDI's DropBox account in order to download and/or copy confidential and proprietary documents, and would then provide such documents and information to HHSC/OIG, which would use them in conjunction with an investigation they were conducting into the business and affairs of HEIDI. After meeting with Dacus and others at HHSC/OIG and formulating the plan and agreement, Morgan then commenced engaging in the agreed activity by downloading and/or copying documents from HEIDI's DropBox account and sending them to Dacus. All of the conspirators, including Morgan, acted under color of law in the course of their illegal search and seizure from HEIDI.

7.25     Morgan is a private actor who, on her own, would not have been acting under color of law. However, a private actor operates under color of law when engaged in prohibited conduct with state officials. *Id.* at 152 ("To act 'under color' of law does not require that the accused be an

officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." They must have "reached an understanding" regarding the prohibited acts.); *Dennis v. Sparks*, 449 U.S. 24, 27-28, 101 S. Ct. 183, 186 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting "under color" of law for purposes of § 1983 actions."). The Fifth Circuit has stated that for a plaintiff to "support § 1983 liability on a theory of conspiracy," he "must allege facts that suggest: 1) an agreement between the private and public defendants to commit an illegal act and 2) an actual deprivation of constitutional rights." *Avdeef v. Royal Bank of Scot., P.L.C.,* 616 F. App'x 665, 675 (5th Cir. 2015). Moreover, "[n]ominally private conduct constitutes 'state action' if the connection between the state and the acts justifies treating the private actor as an agent of the state or otherwise warrants attributing her behavior to the state." *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 387 (5th Cir. 1985).

7.26    As described above, a civil conspiracy involves an agreement to act and actual acts of a tortious nature by one of the members to the agreement. Morgan, Dacus, and some or all the other § 1983 Defendants conspired to deprive HEIDI of its Fourth Amendment rights, all acting under color of law.

7.27    Defendant Dacus and HHSC/OIG received illegally obtained documents and information from Morgan pursuant to the conspiracy on numerous occasions from July 2018 through March 2019, including documents received illegally on at least three occasions: July/August 2018, December 4, 2018, and March 18, 2019.

7.28    Dacus and HHSC/OIG used the information and materials unlawfully obtained for them. First, Morgan's information and accusations were used to help launch a sham investigation into HEIDI, the results of which were preordained.  Second, the groundswell of anti-HEIDI propaganda that was initiated and then weaponized by HHSC/OIG was used on October 12, 2018

as the pretext to terminate HEIDI's contracts just 42 days after their new terms had begun. Third, as Morgan continued to funnel more illegally obtained information to Dacus and HHSC/OIG, complete with additional unfounded accusations, that information was used by the deep state to justify further harassment of HEIDI, even though its goal of removing HEIDI from the Programs had already been accomplished. This additional harassment was in the form of the 2018-19 "investigation" and the 2019-21 final audit, both of which required HEIDI to spend countless hours (with limited staff due to the terminations putting HEIDI on life support) responding to the various information and document requests and other HHSC/OIG inquiries. Fourth, the Morgan information and documents, combined with the anti-HEIDI bias within HHSC/OIG due to its pro-life religious views, contributed to issuance of the false yet damning 2019 Final Report that HHSC/OIG issued without even interviewing Everett. Fifth, the information provided by Morgan concerning her unfounded allegations of improper payments to HEIDI's Medical Directors was referenced in the 2019 Final Report and used as part of the justification for the expanded final audit that dragged on another 19 months.

7.29    Unfortunately, HEIDI was not aware of the conspiracy between Morgan, Dacus, and others at HHSC/OIG, or of the fact that from July 2018 through March 2019 Morgan was acting on their behalf to feed them information unlawfully obtained from HEIDI's DropBox account. HEIDI did not learn of such facts and intrusions until January 2021 when that conspiratorial plan and conduct were revealed in information received from a Freedom of Information Act request HEIDI submitted to the Round Rock, Texas Police Department, which had been investigating a single incident of computer intrusion by Morgan in May, 2019.

7.30    Accordingly, the 1983 Defendants, operating in conspiracy with each other, violated HEIDI's Fourth Amendment right to protection against illegal searches and seizures.

**3**.    <u>**Deprivation of Rights Secured by the Equal Protection Clause**</u>:

7.31    The Fourteenth Amendment to the United States Constitution entitles persons to equal protection of the laws.  Specifically, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. 14.

7.32    HEIDI was denied the equal protection of the laws to which it was entitled, but instead was treated differently from other, similarly situated parties, without a reasonable basis. As described in this Petition, HEIDI was singularly subjected to intrusive harassment by HHSC and OIG, including unlawful search and seizure, bias-based contract terminations, unending audits, and the other actions described above, unlike any other program participant.  Moreover, there was no reasonable basis for HEIDI's disparate treatment at the hands of State.  HEIDI was subjected to such treatment because of its pro-life beliefs.  Such discrimination on the part of the Official Capacity Defendants violates the Equal Protection Clause of the Fourteenth Amendment.

**4.**    <u>**Due Process Clause**</u>

7.33    The United States Constitution protect persons from deprivation by the State of "life, liberty or property" without "due process."  U.S. CONST. amends. 5 and 14.

7.34    The Official Capacity Defendants took actions that deprived HEIDI of life, liberty or property without due process.  As detailed *supra*, they embarked on an extensive and nefarious plot to terminate HEIDI's contractual rights and destroy its reputation and business. And while the entire course of treatment reflects an utter disregard for HEIDI's due process rights, the fact that the "investigators" refused to give Everett an opportunity to even respond to the allegations before striking mortal blows is especially alarming from a due process standpoint.  For example, in their November 2019 Final Report, HHSC and OIG rendered decisions against HEIDI with virtually no

process at all—including no hearing or even an interview with Everett.  The 2019 Final Report should have been the culmination of a process whereby HEIDI was given the opportunity to respond to the false and defamatory pretexts given by the State to justify the contract terminations. Instead, without giving HEIDI the promised opportunity to state its case, the State doubled down with an even more false and defamatory report, thereby using (abusing) its power in an effort to unilaterally destroy HEIDI without even giving HEIDI the opportunity to state its case. The contract terminations that were accompanied by representations of wrongdoing on the part of HEIDI, along with the nature of the pre- and post-termination "investigations" used to justify those terminations, the false and defamatory 2019 Final Report that memorialized the so-called findings of the investigation, which was used to further justify the terminations and warrant 19 more months of audit, all while never giving HEIDI an opportunity to respond and defend itself, constituted a course of conduct that deprived HEIDI of its due process rights under the Texas Constitution.

5.     **Establishment Clause**

7.35    The First Amendment provides that "Congress shall make no law respecting an establishment of religion . . .." U.S. CONST. amend.1. The Establishment Clause applies to the states through the Fourteenth Amendment. *See Everson v. Board of Educ.,* 330 U.S. 1, 8 (1947). Despite the precise language of the Establishment Clause, passage of "a law" by "Congress" is not required for a violation to exist.  In *Everson*, the Supreme Court outlined the breadth of the Establishment Clause, which included that: "No person can be punished for entertaining or professing religious beliefs or disbeliefs . . .." *Id.* at 15-16; *Williams v. Huff*, 52 S.W.3d 171, 186 (Tex. 2001).  Moreover, the government may not "appear 'to take a position on questions of religious belief.'" *Williams,* 52 S.W.3d at 190. Merely conveying a message endorsing or disfavoring religious beliefs by government officials can constitute a violation of the

Establishment Clause. *Id,* at 192 ("the County cannot, consistent with the Establishment Clause, convey a message that endorses the personal religious beliefs of county officials in attempting to rehabilitate criminal offenders. Such an endorsement of religion is, by any test of which we are aware, unconstitutional.").

7.36    As detailed in this Petition, the Official Capacity Defendants, acting on behalf of HHSC and OIG, intentionally targeted and discriminated against HEIDI due to its pro-life religious beliefs. They took such actions to hinder HEIDI's ability to provide pro-life guidance in accordance with its pro-life religious beliefs. In doing so, the Official Capacity Defendants took actions antagonistic to HEIDI's pro-life religious beliefs, conveyed a message disfavoring such beliefs, and punished HEIDI for embracing and championing such beliefs, all in violation of the Establishment Clause.

### 6.    *Free Exercise Clause:*

7.37    The First Amendment also provides that "Congress shall make no law prohibiting the free exercise [of religion] . . .." U.S. CONST. amend.1. The Free Exercise Clause applies to the states through the Fourteenth Amendment. *See Everson v. Board of Educ.,* 330 U.S. 1, 8 (1947). The Supreme Court has stated that the Clause "withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions there by civil authority. *Abington School District v. Schempp,* 374 U.S. 203, 222-23 (1963). It therefore precludes "governmental regulation of religious *beliefs." Sherbert v. Verner,* 374 U.S. 398, 402 (1963).

7.38    The Official Capacity Defendants violated HEIDI's rights under the Free Exercise Clause of the First Amendment by discriminating against, harassing, and cancelling its contracts based on its pro-life religious beliefs. By such actions, the Official Capacity Defendants, acting

on behalf of HHSC/OIG, established a State preference for similarly situated persons with pro-choice or neutral choice religious beliefs—i.e., the other Program participants.

   7.    **Remedies**:

   7.39    With respect to the Official Capacity Defendants, HEIDI seeks a declaration that they violated HEIDI's constitutional and statutory rights, as detailed above, and further seeks equitable relief enjoining further violations thereof, a prospective mandatory injunction or other equitable order restoring HEIDI to its pre-contract termination position as an active member of the Programs, and an order compelling them to issue a statement retracting their public criticism of HEIDI.

   7.40    HEIDI seeks, against the other § 1983 Defendants (Morgan, Johnson, Jennifer Kaufman, Dacus, and the John/Jane Doe Defendants), in their individual capacities, an award of money damages for the injuries sustained by HEIDI because of the constitutional violations.[4]  Such damages include the substantial actual damages suffered by HEIDI, which has virtually ceased operations because of the violations, in addition to damages for loss of reputation and punitive damages. *Smith v. Wade*, 461 U.S. 30, 56, (1983) ("jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.")

   7.41    HEIDI further seeks attorney fees and court costs pursuant to 42 U.S.C. § 1988(b); *See Hutto v. Finney*, 437 U.S. 678, 694 (1978) ("The legislative history is equally plain: '[It] is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or

---

[4] Morgan is included for damages only with respect to the Section 1983 claim for illegal searches and seizures in violation of the Fourth Amendment.

local government (whether or not the agency or government is a named party).'"). Other than the claim for costs and attorneys' fees, Plaintiff does not seek money damages against the Official Capacity Defendants.

**C.    Count III:  Violation of Texas Civil Practice and Remedies Code ("TCPRC") § 106.001, et. seq.**

7.42    HEIDI incorporates all the foregoing and succeeding paragraphs herein to the extent not inconsistent herewith.  HEIDI would further show as follows:

7.43    This cause of action is asserted against (a) HHSC, (b) OIG, and (c) the Official Capacity Defendants (Young, Sylvia Kauffman, Johnson, Jennifer Kaufman, Dacus, and the John/Jane Doe Defendants in their respective official capacities) (collectively referred to herein as the "TCPRC Defendants").

7.44    Pursuant to Texas Civil Practice and Remedies Code ("TCPRC") § 106.001(a):

An officer or employee of the state or of a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin:

(1) . . .

(4) refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state;

(5) refuse to grant a benefit to the person;

(6) impose an unreasonable burden on the person; or

(7) refuse to award a contract to the person.

TCPRC § 106.001(a).

7.45    As detailed in this Petition, the TCPRC Defendants, while acting or purporting to act in their official capacities, targeted and discriminated against HEIDI due to its pro-life religious beliefs.  *See Lloyd v. Birkman*, 127 F. Supp. 3d 725, 758 (W.D. Tex. 2015) (analyzing whether

pro-life beliefs are religious under Title VII where two employment candidates were both Christian). The *Lloyd* court stated:

> Under Title VII, the term "religion includes all aspects of religious observance and practice, as well as belief." 42 U.S.C. Sec. 2000e(j). Given that this term includes religious practices beyond specific religious categories, the Court finds that alleged differences in religious beliefs between Lloyd and Stofle are significant for Title VII purposes. *See Davis v. Fort Bend Cty.*, 765 F.3d 480, 485 (5th Cir. 2014) ("[A] court's task is to decide whether the individual's beliefs are, in his own scheme of things, religious.").

*Id.* at 758.

7.46    Pursuant to said targeting / discrimination, the TCPRC Defendants, acting for HHSA and OIG, terminated HEIDI's participation in the State's HTW and FPP programs. Although HEIDI was initially allowed to participate, these Defendants' subsequent activities were aimed at and resulted in ending such participation and amounting to a refusal to permit participation and refusal to grant benefits as prohibited by TCPRC 106.001(a) (4-5).

7.47    Moreover, the other extensive actions by the TCPRC Defendants detailed above imposed unreasonable burdens on HEIDI in violation of TCPRC(a)(6), creating such a crush of pressure that its operations have virtually ceased, and its continued viability is threatened. In addition, HHSC's and OIG's public comments criticizing HEIDI based on a false narrative created specifically to harm HEIDI due to its pro-life religious beliefs, for which no retraction has been issued to date, constitute a continued unreasonable burden on HEIDI. Likewise, the false media narrative that was published against HEIDI, using false information supplied by some or all the TCPRC Defendants, continues to constitute an unreasonable burden on HEIDI. Such burdens were not imposed on any other participants but were imposed upon HEIDI because of its religious pro-life beliefs.

7.48    Finally, the termination of HEIDI's contracts very shortly after the renewals went into effect was tantamount to a refusal to award the contracts to HEIDI in violation of TCPRC 106.001(a)(7).

7.49    Accordingly, pursuant to TCPRC Sec. 106.002, HEIDI sues the TCPRC Defendant, for preventative relief, including a permanent or temporary injunction, a restraining order, or any other order." Tex. Civ. Prac. & Rem. Code Sec. 106.002.  Pursuant to this statute, HEIDI now seeks equitable relief enjoining further violation of TCPRC 106.001, a prospective mandatory injunction or other equitable order restoring HEIDI to its pre-contract termination position as an active member of the Programs, and an order compelling Defendants HHSC and OIG to issue a statement retracting their public criticism of HEIDI.

7.50    Of further relevance to this cause, TCPRC 106.002(b) provides for attorneys' fees "unless the state is the prevailing party," and notes that "[t]he state's liability for costs is the same as that of a private person." This section constitutes a waiver of sovereign immunity for actions brought against the state under TCPRC Chapter 106.  *Richards v. Mena*, 907 S.W.2d 566, 569 (Tex. App. – Corpus Christi 1995, writ dism'd) (TCPRC 106.002(b) "provides for an express waiver of the State's governmental immunity to those prohibited acts listed in [TCPRC] § 106.001."); *see The State Bar v. Gomez*, 891 S.W.2d 243, 244 n.2 (Tex. 1994) (stating that TCPRC 106.001 "generally prohibits the state or its agents from discriminating against persons because of . . . religion," and noting that "injunctive relief [and] attorney fees" are available to a successful litigant.").   Accordingly, HHSC and OIG are liable for the actions and relief described herein.

7.51    As outlined in this Petition, the actions of the TCPRC Defendants amount to substantial violations of HEIDI's rights under CPRC 106.001, *et. seq.*.  These violations did not involve the exercise of discretion by these Defendants, but rather they acted without legal authority

and in direct contravention of the non-discretionary statutory provisions they were required to follow. They are not entitled to official immunity because (a) they were not performing discretionary duties but instead had no discretion to deprive HEIDI of its statutory and constitutional rights and privileges and (b) they did not act in good faith. They are not entitled to qualified immunity because (a) they were not exercising discretionary functions and (b) they violated "clearly established statutory or constitutional rights of which a reasonable person would have known."

**D.    Count IV: Private Cause of Action against the Individual Defendants for Violation of Chapter 33 of the Texas Penal Code and for Abetting and Conspiring with Respect to Same.**

7.52    HEIDI incorporates all the foregoing and succeeding paragraphs herein to the extent not inconsistent herewith. HEIDI would further show as follows:

7.53    This cause of action is asserted against Defendants Morgan, Johnson, Jennifer Kaufman, Dacus, and the John/Jane Does Defendants, in their individual capacities (collectively, the "TPC Defendants").

7.54    The Texas Penal Code ("TPC") criminalizes the unauthorized access of someone else's computer, including as follows:

> (a) A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."
>     . . .
> (b-1) A person commits an offense if, with the intent to . . . harm another . . . the person knowingly accesses (1) a computer, computer network, or computer system without the effective consent of the owner.

Texas Penal Code § 33.02(a), (b-1). As detailed in this Petition, the TPC Defendants, took actions and/or abetted in actions and/or conspired to take actions to access HEIDI's computers, computer network, and/or computer system in violation of this statute.

7.55    Pursuant to TCPRC § 143.001:

(a) A person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code, has a civil cause of action if the conduct constituting the violation was committed knowingly or intentionally.

(b) A person must bring suit for damages under this section before the earlier of the fifth anniversary of the date of the last act in the course of the conduct constituting a violation under Chapter 33, Penal Code, or the second anniversary of the date the claimant first discovered or had reasonable opportunity to discover the violation.

TCPRC § 143.001.

7.56    As outlined above, between July 2018 and March 2019, Defendant Morgan repeatedly violated TPC 33.02 by accessing HEIDI's computer network and computer system for purposes of copying confidential and proprietary documents and information belonging to HEIDI. A person "accesses" a "computer, computer network, computer program, or computer system" if, *inter alia,* they "retrieve or intercept data from" any of the foregoing. TPC 33.01(1). A "computer" is defined to mean "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device that performs logical, arithmetic, or memory functions" and "includes all . . . output [or] storage . . . that are connected or related to the device." *Id.* 33.01(4). A "computer system" means "any combination of a computer or computer network with the . . . computer software." *Id.* 33.01(8). HEIDI's office computers and DropBox account constituted a "computer" or "computer system" as defined in TPC 33.01(4) and (8), respectively, in that the physical computers were "connected or related" to the DropBox account that was used for "output" and "storage." Data was regularly uploaded and downloaded between the HEIDI computers and its DropBox account.

7.57    Morgan illegally accessed HEIDI's computers and computer system when, between July 2018 and March 2019 she logged into HEIDI's DropBox account, without HEIDI's consent,

and downloaded HEIDI information in violation of TPC 33.02(a). Her actions also violated TPC 33.02(b-1).

7.58    Defendant Dacus violated TPC 33.02 by accessing HEIDI's computer, computer network, or computer system. "Access" is defined to mean, *inter alia,* "to . . . make use of any resource of a computer, computer network, computer program, or computer system." TPC 33.01(1). "Computer" includes "all . . . output [or] storage . . . that are . . . related to the device." Defendant Dacus made use of the output and storage from HEIDI's computer and computer system by receiving such information from Morgan and using it in HHSC/OIG's investigation of HEIDI. Defendants Johnson, Jennifer Kaufman, and the John/Jane Doe Defendants also accessed HEIDI's computer and computer system by making use of the output from those systems and, on information and belief, acting in concert with Dacus and Morgan in connection with the computer intrusions.

7.59    Moreover, Defendant Dacus and, on information and belief, Defendants Johnson, Jennifer Kaufman, and the John/Jane Doe Defendants abetted, and conspired with Morgan in her criminal conduct. They abetted her criminal intrusions by knowing of her criminal intrusions and intentionally encouraging her to copy HEIDI files and provide them to OIG by, *inter alia*, expressing appreciation for such intrusions, which was a substantial factor in causing the violations. Dacus and Morgan, and on information and belief, these other Defendants, also conspired in that regard. The conspiracy: (1) consisted of at least two individuals (Dacus and Morgan); (2) was for the purpose of accomplishing the illegal purpose of the computer intrusions described above; (3) involved a meeting of the minds between the conspirators with respect to the intrusions; (4) included one of the conspirators (both Morgan and Dacus) actually engaging in the

illegal acts; and (5) resulted in HEIDI being injured as a proximate result of the unlawful intrusions.

7.60    Accordingly, based on the above, HEIDI now seeks damages against some or all of Defendants Johnson, Jennifer Kauffman, Dacus, Morgan, and the John/Jane Doe Defendants, jointly and severally, in their individual capacities, for the injuries to HEIDI because of said Defendants' knowing and intentional violations of TPC 33.02 and/or their abetting and/or conspiracy to violate TPC 33.02. Such damages include the substantial actual damages suffered by HEIDI, which has virtually ceased operations because of the violations, in addition to mental anguish damages and punitive damages. Plaintiff also seeks its attorneys' fees and costs pursuant to CPRC 143.002. Tex. Civ. Prac. & Rem. Code § 143.002.

## VIII.   Attorneys' Fees

8.1    HEIDI asserts that it is entitled to its reasonable and necessary attorney's fees pursuant to (1) the Texas Uniform Declaratory Judgment Act; (2) 42 U.S.C. § 1988(b); (3) Tex. Civ. Prac. & Rem. Code Sec. 106.002; and (4) Tex. Civ. Prac. & Rem. Code § 143.002.

## IX.   Jury Demand

9.1    HEIDI demands a jury trial and tenders the appropriate fee with this Petition.

## X.   Prayer

10.1    For these reasons, HEIDI asks that the Court issue citation for Defendants to appear and answer, and that HEIDI be awarded a judgment for the following:

a.    Injunctive and equitable relief as detailed in this Petition;

b.    As against Defendants Dirk Johnson, Jennifer Kaufman, Gaylon Dacus, the John/Jane Doe Defendants, and Phyllis Morgan, in their individual capacities, actual damages, consequential damages, and punitive damages;

b.    Prejudgment and post-judgment interest;

c.    Court costs;

d.     Attorney's fees; and

e.     All other relief to which HEIDI is entitled at law or in equity.


Dated: April 27, 2023.

                              Respectfully submitted,

                              **WATT LAW FIRM, P.C.**


                              /s/  Edward P. Watt_____
                              Edward P. Watt
                              State Bar No. 20976500
                              edwatt@wattlaw.com
                              800 Hwy. 290 West
                              Building A, Suite 100
                              Dripping Springs, Texas 78620
                              (512) 894-4404  (Phone)
                              (512) 858-0770  (Fax)

                              **ATTORNEYS FOR PLAINTIFF**


                   **CERTIFICATE OF SERVICE**


        I hereby certify that on this 27th day of April, 2023, a true and correct copy of the forgoing has been e-served on all parties.

                              /s/  Edward P. Watt_____
                              Edward P. Watt